UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

|  |  |
|---|---|
| DISH NETWORK L.L.C., | x<br>:<br>: |
| Plaintiff, | :    Case No.  26-cv-01350<br>: |
| - against - | :    **COMPLAINT**<br>:<br>: |
| IDRISS ELKASMI (a/k/a IDRISS EL-<br>KASMI), ALI EZZAARY, and DOES 1-10, | :<br>:<br>: |
| Defendants. | :<br>:<br>:<br>x |

Plaintiff DISH Network L.L.C. ("DISH"), by and through its undersigned attorneys, for its

Complaint against Idriss Elkasmi (aka Idriss El-Kasmi), Ali Ezzaary, and Does 1-10 (together,

"Defendants"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      This copyright infringement action arises out of DISH's sweeping, five-year

investigation into a global pirate television service that is or has been branded to customers in the

Southern District of New York, and throughout the United States, by the names DMTN IPTV, Idriss

Premium TV and Manx TV (the "Infringing Service").

2.      The Infringing Service unlawfully transmits, and publicly performs in the United

States, television channels (and the copyrighted programs on those channels) originating from

countries including Bangladesh, Brazil, Egypt, India, Lebanon, Pakistan, and Saudi Arabia that are

(or were during the relevant period) exclusively licensed to DISH in the United States.  Without

authority from DISH, the Infringing Service streams these channels to its customers in the United

States (the "Service Users") on a continuous basis, seven days a week, 24 hours a day.

3.      While consumers can select from a variety of legal television services (such as those

offered by DISH), illegal streaming services (like the Infringing Service) also exist.  Illegal

streaming services can offer consumers thousands of television channels at a fraction of the cost charged by legal providers such as DISH because they do not pay fees to license the content they deliver. To wit, the Infringing Service's website promises "No More Expensive Cable Bills,"[1] and offers customers in the United States a 12-month subscription for just $85.[2]

4.      By infringing DISH's exclusive rights under the U.S. Copyright Act, the Infringing Service irreparably harms DISH in numerous ways. The Infringing Service directly competes with authorized subscriptions to DISH's television programming, thereby causing lost market share, lost subscription revenues, lost advertising revenues, and price erosion for legitimate services. The Infringing Service also disrupts DISH's relationships with authorized distributors in the United States, deprives DISH of its exclusive rights to control the distribution and quality of its copyrighted television programming, interferes with DISH's ability to develop a lawful market for television programming in the United States, and damages DISH's business reputation and goodwill.

5.      The Infringing Service is managed and operated by Defendant Elkasmi, together with other individuals whose identities are not currently known to DISH (certain "Doe Defendants") (together, the "Direct Infringers"). The Direct Infringers work hand-in-hand with Defendant Ezzaary, as well as with other companies and individuals whose identities are not currently known to DISH (certain Doe Defendants) (together, the "Secondary Infringers"), who promote and enable access to the Infringing Service in the United States and collect payments from Service Users—all with actual knowledge that their activities constitute copyright infringement under U.S. law. Even after receiving 68 cease-and-desist notices from DISH between 2021 and 2026, Elkasmi and the other Defendants have defiantly continued to operate the Infringing Service, willfully infringing

---

[1] https://dmtn8k.com/ (last visited Feb. 16, 2026).

[2] https://dmtn8k.com/dmtn-iptv-plans/ (last visited Feb. 16, 2026).

DISH's copyrights on a massive scale with actual knowledge that their activities are unlawful.

6.     Defendants take elaborate steps to evade enforcement of U.S. copyright law.  They operate through various shell companies, use fictitious business names and addresses, and generate phony sales receipts to Service Users that falsely identify subscriptions to the Infringing Service (*e.g.*, labeling a subscription to the Infringing Service as "The Philos Brown Leather Backpack" in a PayPal transaction description).  They unlawfully deliver the Infringing Service to Service Users from computer servers located throughout the world and regularly move those servers to different hosting companies in order to avoid detection and enforcement.

7.     Without intervention from this Court in the form of a permanent injunction and substantial monetary damages, Elkasmi and the other Defendants will likely continue to promote their illegal scheme with impunity.

## THE PARTIES

8.     DISH is a limited liability company organized under the laws of the State of Colorado, with its principal place of business located at 9601 South Meridian Blvd., Englewood, Colorado 80112.

9.     On information and belief, Defendant Elkasmi is a citizen of Morocco and resides in or around Fes, Morocco.  In addition to managing and operating the Infringing Service, he is also associated with several tourism-oriented businesses in Fes, including Fes Tours, Amskou Camp, and Volubilis Tours.  He is also associated with an online store called Genuine Leather.

10.     On information and belief, Defendant Ezzaary is a citizen of Morocco.

11.     The Doe Defendants are additional individuals or entities doing business as DMTN IPTV, Idriss Premium TV, and/or Manx TV.  The Doe Defendants take elaborate steps to conceal their identities and, consequently, DISH does not currently know their true identities.

4900-7228-8395v.4 0090227-000015

## JURISDICTION AND VENUE

12.     DISH asserts claims under the Copyright Act, 17 U.S.C. § 101 *et seq*.  This Court

has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.

13.     Personal jurisdiction over each of the Defendants is proper, as they have each

purposefully directed their conduct towards, and have purposefully availed themselves of, the

privileges of conducting business activities within this state by, among other things, transmitting,

selling, and supplying the Infringing Service to Service Users in the Southern District of New York,

deriving substantial revenue from the use in this state and this district of the Infringing Service, and

causing injury to DISH in this state and in this district.  Personal jurisdiction over Defendants is

also proper because during the relevant time period, Defendants stated on their website that they

operate the Infringing Service from offices in New York.  Alternatively, to the extent that any of

the Defendants are not subject to personal jurisdiction in any state's courts of general jurisdiction,

the exercise of personal jurisdiction over that Defendant is proper pursuant to Fed. R. Civ. P. 4(k)(2)

because DISH's claims arise under federal law, and the exercise of jurisdiction is consistent with

the United States Constitution and United States law.

14.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)-(3) because a

substantial part of the events causing DISH's claims occurred in this district, and because

Defendants are subject to personal jurisdiction in this district.  Venue is also proper under

§ 1391(c)(3) because, upon information and belief, Defendants are nonresidents in the United States

who may be sued in any judicial district.  Venue is also proper in this Court under 28 U.S.C. §

1400(a) because the case involves violations of the U.S. Copyright Act.

4

## FACTUAL BACKGROUND

**A.    DISH's Copyrights**

15.    Plaintiff DISH is the fourth largest pay-TV provider in the United States, providing copyrighted programming to millions of subscribers nationwide.  DISH is also one of the largest providers of international television channels in the United States.

16.    DISH contracts for and licenses rights for works aired on the international channels distributed on its platform from channel owners and their agents including: B4U U.S., Inc.; Bennett, Coleman & Company Limited; GloboSat Entertainment LLC; International Media Distribution (Luxembourg) S.A.R.L.; MSM Asia Limited; Soundview ATN LLC; Soundview Broadcasting, L.L.C.; and World Span Media Consulting, Inc. (collectively, the "Programmers").

17.    The Programmers' channels include: Al Hayah 1 (aka Al Hayat 1); ART Aflam 1; ART Aflam 2; ART Cima; ATN Bangla; ATN News; B4U Movies; CBC; CBC Drama; Hekayat; LBC; LBCI (aka LDC); Melody Aflam; Melody Classic; NTV Bangla; SAB; Sahara One; Sahara Samay; SET Max; SET (aka Sony SET); Times Now; and  Zoom (collectively, the "Protected Channels").  The Programmers acquire copyrights in the works that air on their respective channels, including by creating the works and by assignment.

18.    DISH entered into signed, written license agreements with the Programmers granting DISH the exclusive rights to distribute and publicly perform the copyrighted works that appear on the Protected Channels in the United States (the "Works") by means including satellite,

over-the-top ("OTT"),[3] IPTV,[4] and internet.  DISH's exclusive rights to distribute and publicly perform the Works were in effect at all times relevant to this lawsuit.[5]  Many of the Works that aired on the Protected Channels are registered with the U.S. Copyright Office.  *See* **Exhibit 1** (list of 141 Registered Works.)

19.     There are also a vast number of other programs that aired on the Protected Channels whose episodes are each copyrighted Works to which DISH holds or held exclusive distribution and public performance rights and for which not all episodes have been registered with the U.S. Copyright Office.[6]

20.     The Direct Infringers knowingly and unlawfully transmit, carry, and publicly perform in the United States the Protected Channels (and the Works) via the Infringing Service. Defendants have not been and currently are not authorized by DISH to transmit, distribute, or publicly perform the Protected Channels or the Works in the United States, and Defendants have

---

[3] "An over-the-top media service, also known as OTT and over-the-top television (or over-the-top radio), is a digital distribution service of video and audio delivered directly to viewers via the public Internet ...."  https://en.wikipedia.org/wiki/Over-the-top_media_service (last visited Feb. 16, 2026).

[4] "Internet Protocol television (IPTV), also called TV over broadband, is the service delivery of television over Internet Protocol (IP) networks. Usually sold and run by a telecom provider, it consists of broadcast live television that is streamed over the Internet (multicast) — in contrast to delivery through traditional terrestrial, satellite, and cable transmission formats — as well as video on demand services for watching or replaying content (unicast)." https://en.wikipedia.org/wiki/Internet_Protocol_television (last visited Feb. 16, 2026).

[5] DISH's exclusive rights as to the Protected Channels are currently in effect, with the exception of certain channels for which DISH's exclusive rights expired on November 29, 2023 (Al Hayah 1; ART Aflam 1; ART Aflam 2; ART Cima; Hekayat; LBC; and LBCI); certain channels for which DISH's exclusive rights expired on February 7, 2024 (ATN Bangla and ATN News); and certain channels for which DISH's exclusive rights expired on April 3, 2024 (Sony SET, and SAB).

[6] Since the programs that make up the Protected Channels are non-United States works, registration with the United States Copyright Office is not a prerequisite to filing a copyright infringement action with respect to these works.  17 U.S.C. §§ 101 and 411.

6

paid no compensation to DISH in connection with the unlicensed transmission and public performance in the United States of the Protected Channels or the Works. Nevertheless, without authorization from DISH, the Direct Infringers take broadcasts of the Works soon after the original, authorized transmissions, transfer them to one or more computer servers under their control, and then transmit them to Service Users through the Infringing Service.

**B.      The Infringing Service**

21.    Throughout the course of DISH's five-year investigation, DISH has observed the Infringing Service transmitting the Protected Channels to Service Users on a continuous basis.

22.    Once a Service User purchases a subscription to the Infringing Service from Defendants, Defendants provide that Service User with credentials that the Service User can then use to access the Infringing Service using their home computer, portable device, or an Android-based set-top box.

23.    At various times, Defendants have used an array of websites and social media platforms, like Facebook,[7] to promote and market the Infringing Service, including: https://dmtn-iptv.net; https://dmtn-tv.net/; https://dmtn4k.com/. As of the filing of this Complaint, the sites being actively being used by Defendants to promote and sell the Infringing Service are https://dmtniptv.net/ and https://dmtn8k.com/.

24.    One (currently disabled) website that was used by Defendants was dmtn-tv.net. An archived printout of this website is attached hereto as **Exhibit 2**. The website provided a nonexistent address in New York ("29 Nicolas str [sic], New York, 987597-50") as the "location" of the Infringing Service. *Id.* Defendants advertised on this website that the Infringing Service

---

[7] *See* https://www.facebook.com/profile.php?id=100088540017635 (last visited Feb. 16, 2026).

4900-7228-8395v.4 0090227-000015

provided "best in class quality," compatibility with multiple types of devices, and "13000+channels." *Id.*





25.    Defendants also used this website to provide Service Users with detailed instructions on how to access the Infringing Service on multiple types of devices:



26.    Another (currently disabled) website used by Defendants to promote and market the Infringing Service was dmtn4k.com.   An archived printout of this site is attached hereto as **Exhibit 3**.  It touted the Infringing Service as "the #1 Recommended IPTV provider. . . . [w]ith

more than 20K Live channels from around the world." *Id.*  Defendants also candidly admitted in another section of the website titled Frequently Asked Questions that IPTV services "may offer unauthorized or pirated material, which is illegal in many countries." *Id.*

27.    As of the filing of this Complaint, the website that Defendants are currently using to promote and market the Infringing Service is <u>dmtn8k.com</u>.  It promises "No More Expensive Cable Bills" and boasts that it allows customers to bypass "traditional satellite signal or cable television formats . . . [and]  stream channels and media directly from the source to your device." *Id.* Defendants further state on the site that the Infringing Service "can be installed on any Device," including Smart TVs, Android or Apple devices, or personal computers. *Id.*  It advertises a 12-month subscription to the Infringing Service for $85. *Id.*

4900-7228-8395v.4 0090227-000015



4900-7228-8395v.4 0090227-000015

C.    **DISH's Investigation**

28.    DISH's investigation into the Infringing Service began in 2020.  Since then, DISH's investigators have been purchasing subscriptions to the Infringing Service and monitoring the Defendants' continuous transmission and public performance of the Protected Channels, which are available through the Infringing Service seven days per week, 24 hours per day.

29.    As described in greater detail below, Defendants use a constantly changing array of websites and email addresses in an attempt to evade enforcement of copyright law

<u>2020 Purchase</u>

30.    In 2020, a DISH investigator visited the website dmtn-iptv.net, a currently disabled site that Defendants used at that time to promote and sell the Infringing Service to Service Users.  Using this website, the investigator purchased a 12-month "Golden" package subscription, which was priced in British Pounds for £89.50.

31.    After agreeing to purchase the "Golden" package, the investigator then received an email from Defendants (from the email address dmtniptvserver@gmail.com) containing a link to submit a credit card payment.  As shown in the screenshot below, the email stated that for the purpose of this transaction, Defendants "changed" the name of the Infringing Service to avoid "any bank problems" (*i.e.*, to evade bank detection processes that might flag illegal activity):



32.     Upon payment, the investigator received a second email from the same email address containing credentials that the investigator used to access the Infringing Service, including the Protected Channels.

<u>2022 Purchase</u>

33.     By 2022, Defendants were using a different website to promote and sell the Infringing Service to potential customers in the United States: dmtn-tv.net.  *See* Ex. 2.  In 2022, a DISH investigator visited that website and was able to purchase another one-year subscription to the Infringing Service for $90.  After the investigator selected the subscription they wanted to purchase, they were instructed to send payment to Defendant Ezzaary via PayPal using the email address aliezzaary3@gmail.com.

34.     Upon payment, the DISH investigator received a receipt from "vps designs" at the email address contact@dmtn-tv.net.  The investigator subsequently received another email from that same email address, confirming the purchase and providing credentials to access the Infringing Service.  Those credentials were then used by the investigator to access the Infringing Service, including the Protected Channels.

<u>2023 and 2024 Renewal Purchases</u>

35.     In 2023, DISH's investigator received an email from Defendants (using the email address support@dmtn-tv.net), offering a 12-month renewal subscription to the Infringing Service for $81.90.  The investigator paid the fee via PayPal and received credentials that were successfully used to access the Infringing Service.

36.     In 2024, DISH's investigator received another email from Defendants (using the email address support@dmtn-tv.net) offering a 12-month renewal subscription to the Infringing Service for $69.90.  Defendants asked DISH's investigator to submit payment via PayPal to the email address foxstar.mohammed.611996@gmail.com.  The investigator completed the payment as directed and was then able to continue accessing the Infringing Service (and the Protected Channels) using the same credentials as they had been using before.

<u>2025 Purchases</u>

37.     DISH's investigators made three additional purchases of subscriptions to the Infringing Service in 2025.

38.     For the first 2025 transaction, a DISH investigator purchased a 13-month subscription to the Infringing Service from the website dmtn4k.com.  The investigator was prompted to join a WhatsApp chat with Defendant Elksami at the number +212 688-815197.  Defendant Elksami instructed DISH's investigator to send payment via PayPal to the email address

vhostingservices@gmail.com. Upon payment, Elksami sent DISH's investigator a WhatsApp chat with credentials that the investigator used to access the Infringing Service and the Protected Channels.

39.    In a second 2025 transaction, a DISH investigator purchased a four-month subscription to the Infringing Service for $24.48 from the website dmtn4k.com. Upon selecting the four-month subscription option from Defendants' website, DISH's investigator was again instructed to send a WhatsApp message to the number +212 668-815197, a number associated with Defendant Elkasmi. When DISH's investigator sent the message as instructed, Elkasmi responded with a PayPal link to remit payment to another business associated with Defendant Elkasmi, Genuine Leather. The DISH investigator made the payment using an address located in New York, New York. Elkasmi provided a sales receipt, falsely stating that the payment was for a "Philos Brown Leather BackPack." Upon completing payment and after some subsequent communications, Defendant Elkasmi sent DISH's investigator a WhatsApp chat with credentials that the investigator used to access the Infringing Service and the Protected Channels.

40.    DISH's investigator made a third purchase in 2025, this time for a seven-month subscription to the Infringing Service for $43.10 from the website dmtn4k.com. Once again, DISH's investigator (using an address in New York, New York) was directed to send a WhatsApp message to Defendant Elkasmi at +212 668-815197. As before, the payment was processed through Defendant Elkasmi's other business, Genuine Leather, and the receipt falsely stated that the purchase was for "Philos Brown Leather Backpack." Upon payment, Defendant Elkasmi sent DISH's investigator a WhatsApp chat with credentials that the investigator used to access the Infringing Service and the Protected Channels.

E.    **Defendants' Infringement is Willful and Defiant**

41.    DISH's five-year investigation has established that Elkasmi and the other Defendants have actual knowledge that their unauthorized use of the Protected Channels and the Works constitute infringement in violation of the U.S. Copyright Act, and that their infringement is willful.

42.    DISH has repeatedly demanded that the Elkasmi and the other Defendants cease their unlawful activity, but they have refused to do so.  Over the last five years, DISH has sent at least 68 cease-and-desist notices directly to Elkasmi and the other Defendants, demanding that they cease infringing the Protected Channels and the Works.  During that same period, DISH also sent 435 take-down notices to hosting companies used by Defendants in connection with the Infringing Service and to other third parties that host or otherwise enable Defendants' infringing activity.

43.    Even when these hosting companies removed the unauthorized content, the Direct Infringers intentionally interfered with the takedown efforts by, for example, transmitting the Infringing Service from different hosting companies or locations and by creating new websites to market the Infringing Service after their previously used domains were disabled.

44.    The lengths to which Defendant Elkasmi has gone to evade legal consequences for his actions are particularly notable.  Below are screenshots of the Facebook and LinkedIn pages used by Defendant Elkasmi, as they appeared in October 2025:

4900-7228-8395v.4 0090227-000015





45.     By mid-November 2025, as DISH's investigative activity increased in preparation for filing this lawsuit, Defendant Elkasmi took down his LinkedIn profile and suddenly replaced the profile photo on his Facebook account with the photo of a completely different person:



46.     The new photo used by Defendant Elkasmi is in fact an image of a famous Hollywood director named Vince Gilligan, who gained notoriety as the creator of a popular television show called "Breaking Bad," as well as its spinoff, "Better Call Saul."[8]  The exact same image appears on Mr. Gilligan's IMDB page.[9]  There is no indication that Mr. Gilligan has any connection whatsoever to Defendant Elkasmi or the Infringing Service.

47.     In December 2025, DISH's counsel sent cease-and-desist notices to Defendant Elkasmi and to the other Defendants, demanding that they cease their rampant infringement of DISH's copyrighted television shows.  Elkasmi completely ignored DISH's demand.  Other Defendants acknowledged receipt of DISH's notice and feigned compliance by immediately

---

[8] *See* https://www.imdb.com/name/nm0319213/?ref_=mv_desc (last visited on Feb. 16, 2026).

[9] https://www.imdb.com/name/nm0319213/?ref_=mv_close (last visited Feb. 16, 2026).

4900-7228-8395v.4 0090227-000015

disabling the Infringing Service's website, dmtn4k.com. That compliance was short-lived: Defendants immediately erected a replacement website, dmtn8k.com, which remains active. More importantly, despite numerous follow-up communications between Defendants and counsel for DISH, Defendants have expressly refused to disable the Infringing Service.

48.     As of the filing of this Complaint, the Defendants are still operating the Infringing Service, continuously transmitting and publicly performing the Protected Channels and the Works in the United States, seven days a week, 24 hours a day.

## CLAIMS FOR RELIEF

### COUNT ONE
### Direct Copyright Infringement Against the Direct Infringers

49.     DISH repeats and realleges the allegations in paragraphs 1-48.

50.     DISH is a copyright owner under 17 U.S.C. § 106 because DISH holds or held at the relevant times the exclusive right to transmit, distribute, and publicly perform in the United States the Works by means including satellite, OTT, IPTV, and internet.

51.     The Works are original audiovisual works fixed in a tangible medium of expression and are therefore copyrightable subject matter. DISH's copyrights in the Works arise under laws of nations other than the United States that are parties to the Berne Convention for the Protection of Literary and Artistic Works (a treaty to which the United States is a signatory), including Bangladesh; Brazil; Egypt; France; India; Italy; Japan; Lebanon; Pakistan; Poland; Qatar; Saudi Arabia; the United Arab Emirates; and the United Kingdom, where the Works were authored and first published. Under 17 U.S.C. §§ 101, 411, the Works are non-U.S. works and, therefore, registration with the U.S. Copyright Office is not a prerequisite to filing a copyright infringement action. Nonetheless, as shown on Exhibit 1, several of the Works have been registered with the U.S. Copyright Office.

4900-7228-8395v.4 0090227-000015

52.    Without permission from DISH, the Direct Infringers infringe DISH's exclusive rights in the Works by transmitting and publicly performing the Works in the United States through the Infringing Service (using servers controlled by the Direct Infringers) thereby infringing DISH's exclusive rights under 17 U.S.C. § 106.

53.    At all times relevant to this Complaint, the Direct Infringers had actual knowledge that their actions infringe DISH's exclusive rights with respect to the Works.  The Direct Infringers' actual knowledge of their infringing activity is evidenced by the fact that they received at least 68 cease-and-desist notices sent to them by DISH.  The elaborate measures that the Direct Infringers take to evade detection further evidences their awareness that their activities are unlawful.

54.    The infringement of DISH's rights in each copyrighted Work constitutes a separate and distinct act of copyright infringement.

55.    The Direct Infringers are jointly and severally liable for each act of infringement described above because they personally directed, authorized, supervised, or participated in, and financially benefited from, such infringing conduct as alleged herein.

56.    The Direct Infringers' actions are willful, malicious, intentional, and purposeful, and in disregard of and with indifference to DISH's rights.

57.    Unless enjoined by the Court, the Direct Infringers will continue to engage in acts causing substantial and irreparable injury to DISH that includes lost sales, damage to its reputation, and loss of goodwill, for which there is no adequate remedy at law.

## COUNT TWO
### Secondary Copyright Infringement Against The Secondary Infringers

58.    DISH repeats and realleges the allegations in paragraphs 1-57.

59.    As set forth above, DISH's exclusive rights with respect to the Works in the United

States are directly infringed by the Direct Infringers' unauthorized transmission of and public performance of the Protected Channels and the Works.

60.     This direct infringement is knowingly facilitated and enabled by the Secondary Infringers, who encourage and materially contribute to the direct infringement of DISH's exclusive rights by, among other things, promoting and enabling access to the Infringing Service in the United States and collecting payments from Service Users—all with actual knowledge that their activities constitute copyright infringement under U.S. law.

61.     The Secondary Infringers also induce the infringement of DISH's exclusive rights by, among other things, creating the audience for that infringement in the United States.

62.     The Secondary Infringers have the right and ability to supervise the infringing activity set forth above, as well as an obvious and direct financial interest in exploitation of the Protected Channels and the Works.  Despite actual knowledge that the transmission of the Protected Channels and the copyrighted programs that make up the Protected Channels to Service Users in the United States infringes DISH's exclusive rights, the Secondary Infringers have declined to exercise their right and ability to stop this infringing activity.

63.     The Secondary Infringers could have taken simple measures to prevent infringement of DISH's copyrights when they received notices of infringement from DISH.  The Secondary Infringers could have also blocked the Infringing Service from accessing servers and URLs that were identified to be streaming the Protected Channels or Works.

64.     The Secondary Infringers' actions are willful, malicious, intentional, and purposeful, and in disregard of and with indifference to the rights of DISH.

65.    Unless enjoined by the Court, the Secondary Infringers will continue to engage in acts causing substantial and irreparable injury to DISH that include damage to its reputation, loss of goodwill, and lost sales, for which there is no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, DISH prays for judgment against Defendants as follows:

a)    Permanently enjoining Defendants and their officers, agents, servants, and employees, and all those acting in active concert or participation with them, from (i) distributing, publicly performing, and/or in any way transmitting video content in which DISH holds exclusive rights, including the Protected Channels and the Works; (ii) inducing, encouraging, causing, facilitating, and/or materially contributing to the unauthorized distribution, public performance, and/or transmission by others of the Protected Channels and the Works; (iii) distributing, selling, advertising, marketing, or promoting the Infringing Service, or any other service that contains, connects to, offers for download, transmits, assists in the transmission of, streams, hosts, provides access to, otherwise distributes or publicly performs, or displays directly or indirectly, by means of any device or process, any of the Protected Channels and Works; or (iv) enabling, assisting, or consulting with other persons or entities to do any of the activities described in (i)-(iii) above, including by selling, leasing, licensing, assigning, conveying, distributing, loaning, encumbering, pledging, or otherwise transferring, whether for consideration or compensation, any part of their infringing operations;

b)    For the 145 Registered Works listed in Exhibit 1, statutory damages up to $150,000 per Registered Work infringed under 17 U.S.C. § 504(c), or the Defendants' profits attributable to the infringement of those Registered Works under 17 U.S.C. § 504(b);

c)    For unregistered Works, an award of Defendants' profits attributable to the

22

infringement of each unregistered Work under 17 U.S.C. § 504(b);

d)      Awarding DISH its costs of prosecuting this action, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505;

e)      Awarding DISH prejudgment interest and post-judgment interest at the highest legal rate allowed under law;

f)      For an order permanently transferring each domain name that Defendants used in connection with the infringement (including but not limited to dmtn4k.com, dmtn-tv.net, and dmtn8k.com) to DISH, and enjoining any hosting company from supporting the Infringing Service or any other service used to access channels exclusively licensed to DISH.

g)      Directing Defendants to file with this Court within 30 days after the entry of final judgment a written statement, under oath, setting forth in detail the manner in which they have complied with the Judgment of the Court; and

h)      Awarding DISH such other and further relief as this Court deems just, proper, and equitable.

Dated:  February 17, 2026

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By:    _/s/ Robert D. Balin_

Robert D. Balin
Adam I. Rich
1251 Avenue of the Americas
21st Floor
New York, NY 10020
Tel. 212.489.8230
Email:  robertbalin@dwt.com
        adamrich@dwt.com

*Attorneys for Plaintiff DISH Network L.L.C.*

4900-7228-8395v.4 0090227-000015